1   LATHAM & WATKINS LLP

2   NICOLE C. VALCO (SBN: 258506)
    *Nicole.Valco@lw.com*
3   505 Montgomery St.
    San Francisco, California 94111-6538
4   Telephone: 415-391-0600
    Facsimile: 415-395-8095
5
    MATTHEW S. SALERNO (*pro hac vice* pending)
6   *Matthew.Salerno@lw.com*
    1271 Avenue of the Americas
7   New York, New York 10020-1300
    Telephone: 212-906-1200
8   Facsimile: 212-701-9000

9   Attorneys for Plaintiffs
    US VC PARTNERS LP and US VC PARTNERS
10  GP, LLC

11

12

13                      UNITED STATES DISTRICT COURT

14                     NORTHERN DISTRICT OF CALIFORNIA

15                            SAN JOSE DIVISION

16
    US VC PARTNERS LP and US VC          | CASE NO. 5:25-cv-3725
17  PARTNERS GP, LLC
                                          | **COMPLAINT**
18              Plaintiffs,

19         vs.                            | DEMAND FOR JURY TRIAL

20  FEDERAL DEPOSIT INSURANCE
    CORPORATION, as Receiver for Silicon
21  Valley Bank

22              Defendant.

23

24

25

26

27

28

LATHAM&WATKINS LLP

Plaintiff US VC Partners LP ("USVCP") and US VC Partners GP, LLC ("USVCP-GP") (in its capacity as the general partner of USVCP) (collectively, "Plaintiffs") bring this Complaint against Defendant Federal Deposit Insurance Corporation ("FDIC") and allege as follows:

**<u>INTRODUCTION</u>**

1.      President Franklin D. Roosevelt, in his first-ever "fireside chat," assured the nation that "it is safer to keep your money in a reopened bank than it is to keep it under the mattress." Shortly thereafter, Roosevelt signed the Banking Act of 1933, officially establishing the FDIC. Complex as federal banking regulations may be, the FDIC's core directive was straightforward: "to maintain stability and public confidence in the nation's financial system." A critical way the FDIC maintains that public confidence is through its powers as receiver, vested via 12 U.S.C. § 1821 *et seq.* Those receivership powers provide Americans with a simple proposition: forego one's mattress, bank with an FDIC insured depository institution and, should it fail, the FDIC will return what is rightfully yours.

2.      At least, that is how it is supposed to work. But in the wake of Silicon Valley Bank's ("SVB") collapse in 2023, FDIC has done the opposite. It has elected to hold hostage approximately $2,500,000 in deposits belonging to an American company—USVCP—constituting proceeds from various payments made to USVCP from two third-party businesses (the "Account Funds"). It is doing so without legal justification.

3.      That the Account Funds were intended for and belong to USVCP is not credibly in dispute. The funds reflect payments *to* USVCP from third party businesses. Both of those businesses made those payments to USVCP to resolve contractual or other financial obligations, all of which are documented. One of the businesses originating its payments to USVCP is now dissolved; the other made its disbursements to USVCP in the context of a bankruptcy, from which it has now emerged under new ownership, having satisfied its restructuring obligations. In short, so far as they are concerned, both businesses remitted the subject funds to USVCP long ago. Plaintiffs are aware of no individual or entity that has made or claimed any competing ownership over these funds.

4.      By virtue of the fact that USVCP may be at least 50% indirectly owned by entities that are currently subject to the U.S. sanctions regime, the funds sent to USVCP were flagged for review by SVB's internal Office of Foreign Asset Control ("OFAC") interdiction software, which detected a possible connection between USVCP and an individual listed on OFAC's List of Specially Designated Nationals and Blocked Persons ("SDN List").  As a result, SVB placed the Account Funds into four separate blocked accounts ("Blocked Accounts")—one for each of the four payments made by these businesses to USVCP.  On information and belief, SVB's practice was both unnecessary and in error, as banking practice allows such blocked funds to be comingled in a single account.

5.      Due to SVB's OFAC block, which remains in effect, the Account Funds have been sitting at SVB for over four years.  During that time, Plaintiffs and SVB maintained a consistent dialogue about the status of USVCP's funds, always with the understanding and explicit assurance from SVB that these funds did in fact belong to USVCP.  For instance, SVB has provided USVCP's representatives with interest income information so that USVCP could file any required state and federal income tax returns on the proceeds of the interests earned on the Account Funds. At Plaintiffs' direction, SVB even agreed (one day before entering receivership) to transfer the Account Funds to a separate blocked account held by USVCP at Signature Bank, pursuant to permission under a specific OFAC license (the "OFAC License").

6.      When USVCP's representatives initially requested these funds be transferred pursuant to the OFAC License to its account at Signature Bank, SVB incorrectly resisted out of an abundance of caution.  In 2023, however, after re-review of the existing OFAC License permitting such transfers, SVB agreed to transfer the Account Funds to a blocked account at Signature Bank. The transfer would have been finalized had SVB not entered receivership.

7.      Upon SVB's entering receivership, USVCP's representatives promptly resubmitted its request to FDIC that the Account Funds be transferred to another bank of its choosing for safe keeping, consistent with applicable law and the same OFAC License.  In essence, USVCP's representatives asked FDIC to do what SVB had already agreed to do.  Instead, FDIC demurred and delayed, sometimes taking months to respond to Plaintiffs' queries as to the status of its funds.

1    USVCP representatives sent many emails and numerous times offered calls to FDIC, with no

2    substantive response.  Then, 18 months later and out of the blue, FDIC issued a "claims denial,"

3    purporting to inform USVCP that it had no right to its Account Funds.

4          8.       FDIC's determination is arbitrary, capricious, ignores material facts, and is

5    fundamentally unsound and unfair for a number of reasons.  *First*, FDIC ignores material facts,

6    including that the Account Funds were deposited in Blocked Accounts created specifically for the

7    benefit of USVCP, and that the communications between Plaintiffs and SVB over the years have

8    consistently reflected the parties' intent, agreement, and mutual understanding that these accounts

9    belonged to USVCP.  FDIC further ignores that all the documents used to establish and track the

10   Account Funds—transfer instructions and internal block reports—unambiguously listed USVCP

11   as the sole payee and beneficiary of the Account Funds.  FDIC ignores these facts, and others, and

12   relies instead solely and definitively on the fact that the funds were initially blocked by virtue of

13   SVB's internal OFAC interdiction software.

14         9.       *Second*, OFAC granted to USVCP-GP a license explicitly authorizing the transfer

15   of funds blocked by interdiction software intended for USVCP to other consolidated bank

16   accounts.  By refusing to transfer these funds immediately when requested pursuant to the OFAC

17   License, SVB created the conditions to put the Account Funds at risk.  But more importantly, the

18   existence of the OFAC License acknowledges the reality that in light of the impact of the relevant

19   sanctions, USVCP should have the ability to consolidate its blocked funds into consolidated

20   accounts.  Ultimately, SVB even acknowledged that it was permitted to transfer USVCP's Account

21   Funds, and was in the process of doing so when its historic failure truncated that effort.  USVCP

22   should not be prejudiced by SVB's delay and ultimate collapse.  Moreover, as the blocked funds

23   will remain blocked, FDIC has no principled reason for denying USVCP representatives' request

24   to effectuate the transfer according to the OFAC License.    Indeed, that FDIC has

25   contemporaneously permitted more than $54 million of other such transfers of USVCP's blocked

26   assets in other circumstances pursuant to the same OFAC License highlights the arbitrary nature

27   of FDIC's conduct here.

28

10. *Third*, FDIC's belated determination concerning the owners of the Blocked Accounts is fundamentally unfair because neither of the businesses that paid the relevant funds to USVCP still exist in the same form. Identifying these dissolved entities as the owners of the Account Funds would effectively give FDIC a windfall over the funds that all relevant parties—the payees, the holding bank, and Plaintiffs—and the documentary record confirm belong to USVCP.

11. FDIC's attempts to ignore USVCP as the owner of the Account Funds are baseless, arbitrary, capricious, and inequitable. Plaintiffs have attempted to resolve these issues short of the intervention of this Court, including by requesting calls and a tolling of relevant statutory periods to allow for further evidence and negotiation, to no avail. For these and other reasons alleged herein, it now asks this Court to reverse FDIC's determination and find that USVCP has valid claims over the Account Funds.

12. To be clear, the relief requested by Plaintiffs complies with all law and is permitted by the OFAC License. Plaintiffs do not seek that any of the Account Funds be unblocked or accessed. Instead, they simply seeks that USVCP's claim to these funds be recognized, and that these assets be transferred to blocked accounts at a bank of USVCP's choosing, consistent with the permissions of the OFAC License.

## PARTIES

13. Plaintiff USVCP is a multi-stage, technology investment fund that when active invested in equity and debt securities of domestic and international businesses.

14. Plaintiff USVCP-GP is the general partner of USVCP. USVCP-GP is a limited liability company organized under the laws of Delaware, and its principal place of business is 120 East Palmetto Park Road, Suite 405, Boca Raton, FL 33432. USVCP-GP is 100% owned by United States citizens. No entity or persons on OFAC's SDN List or any entity blocked pursuant to OFAC's 50% Rule (described *infra*) has any interest in, or control over, USVCP-GP.

15. Defendant FDIC is an agency of the United States government charged by law with, among other duties, administering the Federal Deposit Insurance Act ("FDI Act"), 12 U.S.C. §

1811 et *seq.*, and the federal bank deposit insurance system.  USVCP sues FDIC in this action in

its capacity as the Receiver for SVB.

## RELEVANT NON-PARTIES

16.     Renova Group a/k/a JSC Renova Group of Companies ("Renova") is a conglomeration of asset management companies and direct and portfolio investment funds.  On April 6, 2018, OFAC imposed sanctions on Renova and its co-founder following the implementation of Executive Order  13662 and added each of them to the SDN List.  The sanctions imposed by OFAC prohibit dealing in (or "block") SDNs' assets that are in the United States, or by a U.S. person (wherever located).  Under OFAC's 50% Rule, 31 C.F.R. § 589.411, OFAC deems any entity in which one or more SDNs have a 50% or greater ownership interest to be sanctioned or "blocked" as if that entity itself were an SDN.

17.     Renova Innovation Technologies, Ltd. ("RIT") is the sole limited partner of USVCP.  Based on historical information in its management file, USVCP's manager believed that Renova may be the ultimate beneficial owner of RIT, though RIT has disputed this fact.  Regardless of this disagreement, USVCP's control parties have always treated USVCP as an entity that may be indirectly owned 50% or more by an SDN and have reported the same to OFAC.  Accordingly, consistent with OFAC's 50% Rule, USVCP is blocked as if it were itself an SDN.

18.     US VC Partners Management, LLC ("USVCP Management") is an investment company with its principal place of business at 120 East Palmetto Park Road, Suite 405, Boca Raton, FL 33432.  USVCP is a limited liability company organized under the laws of Delaware.  USVCP Management is 100% owned by United States citizens.  No SDN or any entity blocked pursuant to the 50% Rule has any direct or indirect ownership interest in, or control over, USVCP Management.

19.     Immutable Systems, Inc. ("Immutable") was an entity based in Mountain View, CA that provided cloud computing services.  On June 21, 2018, Immutable filed a Certificate of Dissolution in the Office of Secretary of State of the State of Delaware.

20.     Gawker Media Group Inc., and Gawker Media LLC (collectively, "Gawker") were online media companies based in New York City, New York.  In June 2016, Gawker filed for

Chapter 11 bankruptcy.  In late 2019, the plan administrator in Gawker's bankruptcy dissolved Gawker, closed its accounts at SVB, represented to the bankruptcy court that all distributions to creditors were made according to the chapter 11 plan, and obtained a final decree closing the bankruptcy cases and terminating the plan administrator's engagement.  In 2023, Gawker was purchased by Meng Ru Kuok, the founder of Singapore-based venture capital firm Caldecott Music Group.

21.    Signature Bank was a New York-based full-service commercial bank with its principal place of business at 565 Fifth Avenue, New York, New York.  Signature Bank was unaffiliated with SVB.  Between 2019 and 2023, USVCP endeavored to have its Account Funds at SVB transferred to its Signature Bank account.  Shortly after SVB's failure, on March 12, 2023, Signature Bank also failed—it was closed by the New York State Department of Financial Services, and FDIC was named Receiver.  At the same time that FDIC denied USVCP's claim and transfer of the Account Funds, FDIC permitted the transfer of more than $54 million of USVCP's blocked assets held at Signature Bank pursuant to the OFAC License.

**JURISDICTION AND VENUE**

22.    This action arises under the Constitution and law of the United States, including, without limitation, the FDI Act, 12 U.S.C. § 1811, *et seq.*, as amended.  The Court has original "arising under" jurisdiction over the asserted federal law claims pursuant to 28 U.S.C. § 1331.

23.    FDIC is subject to suit in this Court.  The FDI Act provides that FDIC may "sue and be sued, and complain and defend, by and through its own attorneys, in any court of law or equity, State or Federal."  12 U.S.C. § 1819(a).

24.    Venue is proper under 28 U.S.C. § 1391(b) and § 1391(e)(1), as the Account Funds were held at SVB, which was located in this District prior to the bank's failure and entry into receivership.  Venue is also proper under 12 U.S.C. § 1821(d)(6)(A), which provides, within 60 days of the disallowance of a claim by FDIC in its capacity as receiver under 12 U.S.C. § 1821(d)(5)(A)(i), a claimant may file suit on such claim "in the district or territorial court of the United States for the district within which the depository institution's principal place of business is located or the United States District Court for the District of Columbia (and such court shall

1    have jurisdiction to hear such claim)."  Venue is also proper under 12 U.S.C. § 1821(f)(4), which

2    provides that a final determination of the FDIC regarding a claim for insurance coverage "shall be

3    a final agency action reviewable . . . by the United States district court for the Federal judicial

4    district where the principal place of business of the depository institution is located."  Here, the

5    principal place of business for SVB was located in this District.

6    ## DIVISIONAL ASSIGNMENT

7        25.    This action should be assigned to this Court's San Jose Division.  Under Rule 3-2

8    of this Court's Civil Local Rules, "[a] civil action arises in the county where . . . a substantial part

9    of the property that is the subject of the action is situated," and all civil actions that arise in the

10    County of Santa Clara "shall be assigned to the San Jose Division."

11        26.    SVB was headquartered in the County of Santa Clara, and a substantial part of the

12    property that is the subject of the action is situated in the County of Santa Clara.  This action

13    therefore arises in the County of Santa Clara and "shall be assigned to the San Jose Division."

14    ## FACTUAL BACKGROUND

15    **A.    USVCP's Business**

16        27.    USVCP is a technology investment fund that when active invested in equity and

17    debt securities of domestic and international businesses.  USVCP is an American entity.  In light

18    of the reporting of USVCP as a blocked entity, it has no ongoing business activities other than

19    attempting to liquidate its assets and wind down operations, pursuant to an applicable OFAC

20    License.

21        28.    USVCP acts by and through its general partner, USVCP-GP and its management

22    company, USVCP Management.

23        29.    As described above, USVCP-GP believes that USVCP's sole limited partner, RIT,

24    may be majority beneficially owned by Renova, which is an SDN.  USVCP has also historically

25    reported this understanding to OFAC.  Pursuant to OFAC's 50% Rule, an entity owned—directly

26    or indirectly—50% or more by an SDN is treated as if it were itself an SDN.  This rule allows

27    OFAC to place restrictions on the property of U.S. companies by virtue of the fact that those

28    companies are indirectly owned by individuals or entities designated by OFAC as SDNs.  Given

1  the reporting of USVCP's ownership information to OFAC, the 50% Rule applies to USVCP's

2  property.   Accordingly, funds paid to USVCP must be placed into blocked accounts at U.S.

3  depository institutions.

4      **B.     Gawker's and Immutable's Payments to USVCP**

5      30.    As of 2018, USVCP was an investor in both Gawker and Immutable.  Both of these

6  companies owed certain investment obligations to USVCP.

7      31.    Between October 2018 and August 2019, Gawker and Immutable sent, in the

8  aggregate, approximately $2.4 million dollars to USVCP in satisfaction of those obligations.

9  Those payments were as follows:

10     32.    *Transfer 1 (Immutable).*  On October 10, 2018, the CFO of Immutable submitted

11  to SVB a cashier's check in the amount of $364,502.15 to payee USVCP.  Immutable's cashier's

12  check was labeled with a memo reading, "Immutable Systems Investor Payout," and Immutable

13  instructed SVB to mail the check to the offices of the General Counsel accepting payment on

14  behalf of USVCP.

15     33.    *Transfers 2 and 3 (Gawker).*  On May 23, 2019, Gawker made two separate wire

16  transfers of $805,621.90 and $750,000 to USVCP's blocked account at Signature Bank.  Both wire

17  transfers were initiated by a chapter 11 bankruptcy plan administrator in connection with Gawker's

18  liquidation.

19     34.    *Transfer 4 (Gawker).*  On August 29, 2019, a representative from AlixPartners, the

20  financial advisor for Gawker's chapter 11 case, alerted USVCP about a final distribution to be

21  made to USVCP in the amount of $513,157.87 in connection with Gawker's dissolution.

22     35.    All four transfers were automatically blocked by SVB's OFAC interdiction

23  software and placed in individual blocked accounts at SVB for USVCP's benefit.  On information

24  and belief, this was both unnecessary and in error, as banking practice allows such blocked funds

25  to be comingled in a single account.  Both Immutable and Gawker closed their SVB accounts after

26  making their payments to USVCP.

27     36.    Today, Immutable no longer exists.   In late 2019, the plan administrator in

28  Gawker's bankruptcy case dissolved Gawker and represented to the bankruptcy court that all

1 | distributions to creditors (including USVCP) were made according to the chapter 11 plan. Gawker
2 | no longer exists in the same form that it did when it initiated its three wire transfers to USVCP,
3 | having emerged from bankruptcy under new ownership and having satisfied its chapter 11 plan.

4 | **C. SVB Correctly Treats the Account Funds As USVCP's and Assures USVCP**
5 | **the Funds Are Safe**

6 | 37.    While USVCP, through its agents, worked with SVB to resolve the OFAC block,
7 | SVB agreed to hold the Account Funds in the four segregated Blocked Accounts for the benefit of
8 | USVCP. Those Accounts were given account numbers ending in -3346; -3384; -3399; and -3411.
9 | Each of the Blocked Accounts was created for the express purpose of holding the funds from the
10 | four money transfers from Gawker and Immutable to USVCP.

11 | 38.    From 2019 to 2023, SVB repeatedly confirmed, in words and in deeds, that
12 | although the Account Funds were maintained in the Blocked Accounts, they were safe and
13 | belonged to USVCP.

14 | 39.    On May 15, 2019, for instance, a representative of USVCP wrote to SVB requesting
15 | statements showing that the funds "are blocked at SVB *and are noted to belong to US VC Partners*
16 | *LP*." Neither Mr. Pieter Ott, Sanctions Compliance Officer at SVB, nor any other member of SVB
17 | challenged USVCP's request. Instead, Mr. Ott attached a document containing "details on the
18 | blocked cashier's check *to beneficiary US VC Partners LP*, and the associated blocked account
19 | at SVB.". The attached document in Mr. Ott's email to USVCP's representative clearly identified
20 | USVCP as the "beneficiary" and the "payee" of the cashier's check.

21 | 40.    On May 23, 2019, in connection with the Gawker wire transfers, a separate
22 | representative of USVCP asked Mr. Ott for assistance in facilitating the transfers such that "these
23 | funds [would be] settled into a *US VC Partners LP blocked account* at Signature Bank." That
24 | representative also requested that SVB provide "support/detail as to where [the Gawker wires] had
25 | been deposited." In response, Mr. Ott provided attachments in the form of OFAC Blocking
26 | Reports, which SVB filed with OFAC, reflecting the "blocked transactions, and the associated
27 | block accounts at SVB." The attached documents again clearly reflected USVCP as the
28 | "beneficiary" of these wires.

LATHAM&WATKINS LLP

COMPLAINT
Case No. 5:25-cv-3725

41.     Finally, on August 29, 2019, in connection with Gawker's third wire transfer, a representative of USVCP instructed SVB to "place the [these funds] into a blocked account at SVB" "*on behalf of US VC Partners LP*" and to then provide him with the supporting documentation.  In response, Mr. Ott responded with the OFAC block report attachment, which again clearly showed USVCP as the beneficiary of the blocked funds.

**D.     USVCP-GP Obtains OFAC License to Transfer Funds from Blocked Accounts**

42.     On July 1, 2019, USVCP-GP and other related entities filed suit against OFAC in the United States District Court for the Southern District of New York in connection with OFAC's seizure of Plaintiffs' property and its failure to grant specific licenses for basic access to Plaintiffs' property.  On June 30, 2020, the day before oral argument on OFAC's motion to dismiss was to take place, OFAC unilaterally issued two licenses.  One of them was the OFAC License described above, which granted Plaintiffs the power to manage certain of their seized property in the context of winding down the operations of those investments.

43.     Among other things, the OFAC License allowed USVCP-GP to "engage in all transactions ordinarily incident and necessary . . .  [to] negotiate and execute the sale, divestment, and transfer of [its] Blocked Positions and maintain operations, including paying related taxes and other fees pending divestment."

44.     Since receiving the OFAC License, Plaintiffs requested confirmation from OFAC's Licensing Division that the OFAC License permitted Plaintiffs to consolidate blocked funds from numerous disparate bank accounts where cash currently resides into one consolidated account at a single financial institution for administrative ease.  This is the exact scenario USVCP faced at SVB.  As is the case here, Plaintiffs made clear that the request for clarification was not a request for funds to be unblocked, but merely a request to consolidate blocked accounts for the purpose of easing their administrative burden and reporting obligations.

45.     At first, OFAC took the position that each movement of blocked funds from one account to another may require its own individual license, which would render the "process"

resource-consuming and logistically challenging.[1]  Given OFAC's position at the time, SVB refused to transfer the Account Funds.  USVCP acquiesced to keeping the Account Funds at SVB for the time being, given the parties' common understanding that SVB had opened the Blocked Accounts expressly for its benefit and that the funds were USVCP's property.

46.    Even though SVB denied USVCP's requests to transfer the Account Funds, it provided USVCP with interest income information regarding all four Blocked Accounts for the express purpose of allowing USVCP to file required income tax reports on the interest earned on the Account Funds.  SVB provided the information based on the understanding that the funds held in all four Blocked Accounts belonged to USVCP, and USVCP therefore may have obligations to file tax reports and pay any taxes due in connection with the Account Funds.

47.    In response to Plaintiffs' formal written request to consolidate funds as part of the OFAC License renewal application in November 2022, OFAC clarified its position that the OFAC License already permitted the consolidation of USVCP's funds in different accounts, and that no additional license was necessary.  In short, OFAC clarified that USVCP's request for transfer of the Account Funds was permissible and consistent with the OFAC License.

48.    After OFAC's renewal of the OFAC License, Plaintiffs again requested confirmation that the OFAC License allowed for the transfer of blocked funds from one bank to another.  On December 30, 2022, Alan Christian, Deputy Assistant Director for Licensing at OFAC, confirmed that, "OFAC considers the transfer of blocked funds to blocked accounts held at Signature Bank as activity ordinarily incident and necessary to the authorizations outlined in SECTION 1(b) of License No. MUL-2020-366977-5."  OFAC's December 30, 2022 email was merely confirmation of the fact that the OFAC License allowed for the transfer of blocked funds, and did not modify the freedoms conferred by the License in any way.  As such, SVB could—should—have initiated the transfer of the Account Funds upon Plaintiffs' first request to do so, long before SVB failed.

---

[1] While OFAC initially took the position that fund transfers might require their own individual licenses, it has since confirmed, in numerous communications to USVCP's representatives and to its outside counsel, that the same OFAC License permits fund transfers by itself and that no additional licenses are necessary.

49.     On March 9, 2023, SVB finally agreed to initiate the transfer of Account Funds from SVB to USVCP's blocked account at Signature Bank, further demonstrating the understanding of all parties that these funds belonged to USVCP, could be transferred, and should have been transferred to a blocked account at Signature Bank, where USVCP maintained an account.

**E.     SVB Collapses in March 2023**

50.     On March 10, 2023, before SVB could carry out USVCP's transfer request, the California Department of Financial Protection & Innovation closed SVB, and FDIC was appointed as the failed-bank's receiver.  But for SVB's receivership, USVCP's Account Funds would have been transferred to Signature Bank.

51.     Shortly after being appointed, FDIC created the Deposit Insurance National Bank of Santa Clara ("DINB") and FDIC in its corporate capacity and as SVB Receiver then entered into a purchase and assumption agreement that immediately transferred to the DINB the liability for insured deposits of SVB for the first few days after SVB's failure.

52.     On Sunday, March 12, 2023, then-U.S. Secretary of the Treasury Janet Yellen, acting on the recommendation of FDIC Board of Directors and the Board of Governors of the Federal Reserve System, invoked the systemic risk exception ("SRE") under 12 U.S.C. § 1823(c)(4)(G).  In the Secretary's own words, her action was meant to calm uninsured depositors' fears in order to prevent runs on additional commercial banks and to protect the Nation's banking system from possible collapse by "fully protect[ing] all depositors" who "[would] have access to all of their money starting Monday, March 13."  (*See* Press Release, U.S. Dep't of the Treasury et al., Joint Statement by Treasury, Federal Reserve, and FDIC (Mar. 12, 2023), https://www.federalreserve.gov/newsevents/pressreleases/monetary20230312b.htm.)

53.     The next day, March 13, 2023, the deposit liabilities and related assets that had been conveyed to the DINB were conveyed back to the SVB Receiver, and the SVB Receiver then transferred liability for all deposits– both insured and uninsured –and substantially all assets of SVB to a bridge bank ("Bridge Bank").  OFAC blocked deposits were not transferred to the Bridge Bank.

54.     On March 26, 2023, the Bridge Bank was placed into receivership.  On March 27, FDIC in its corporate capacity and FDIC as receiver for the Bridge Bank entered into a purchase and assumption agreement under which First-Citizens Bank & Trust Company assumed substantially all deposits and assets of the Bridge Bank (which did not include OFAC blocked deposits).

**F.     USVCP Contacts FDIC to Attempt Fund Transfer**

55.     After FDIC took over as SVB Receiver, representatives of USVCP repeatedly contacted FDIC in order to move the funds to USVCP's blocked account (at Signature Bank). Between May 2023 and July 2024, USVCP's representatives made countless telephone calls and sent more than fifteen emails to FDIC in an attempt to consolidate the Account Funds and provided copious documentations showing that the Account Funds were held in the Blocked Accounts for the benefit of USVCP.

56.     In response to this outreach, FDIC sometimes waited weeks or months before responding, and appeared to take the position that SVB's previously issued OFAC block would still prevent the transfer of the Account Funds, even though that position was contradicted by OFAC's own position that the OFAC License permitted such transfer and SVB's initiation of the transfer of the Account Funds in 2023.

57.     Specifically, on May 16, 2023, a USVCP representative first contacted FDIC to discuss the process of transferring funds from the Blocked Accounts to another bank account pursuant to the OFAC License—a process that was already underway before FDIC took over SVB. USVCP's representative received no response.

58.     After a follow-up email, FDIC finally replied on May 26, noting that due to FDIC's claims process, "these OFAC claims will need to reside in the appropriate receivership and will be reported through our OFAC process going forward."

59.     USVCP's representative replied on the same day requesting a call to discuss the transfer of the blocked funds, and reiterated that the OFAC License allowed USVCP to "move blocked funds from one financial institution to a blocked account in another institution."

60.    On June 1, 2023, USVCP's representative and the FDIC team held a phone discussion regarding USVCP's request to move the Account Funds from SVB to a blocked account at another bank.  During the call, USVCP received assurance from FDIC that the Account Funds were at FDIC and had been backed by FDIC such that the full value of the funds was available to be claimed.  Following the call, USVCP provided FDIC with the OFAC blocking reports and the surrounding communications between it and SVB which, as discussed above, clearly identified USVCP to be the beneficiary of the Account Funds.  FDIC said it would respond based on the information.

61.    On June 27, 2023, USVCP followed up on the phone discussion to request that FDIC provide the claim forms necessary to allow it to file its claim over the Account Funds.  FDIC did not reply to this email.

62.    On July 5, 2023, USVCP followed up again with FDIC and noted that USVCP-GP had received a renewal of the OFAC License, which continued to specifically authorize the transfer of blocked funds to a blocked receiving account.  FDIC also did not reply to this email.

63.    On July 11, USVCP followed up for the third time to request a response from FDIC.

64.    On July 12, Amanda Jennings at FDIC replied and requested USVCP's representative to provide legal documents authorizing USVCP to act on behalf of Immutable and Gawker.  USVCP's representative promptly provided the requested information on the next day, July 13.

65.    In response, Ms. Jennings at FDIC provided confusing guidance, noting at one point that "[d]ue to the claims process, the OFAC claims will need to reside in the appropriate receivership" and at another point that "FDIC is unable to transfer deposit accounts, from a Receivership, with OFAC holds to an open Financial Institution."

66.    In response, USVCP's representative further explained that the OFAC License expressly permitted such fund transfers, noting it "explicitly allows for movement of money in circumstances such as this, i.e., from a block at one bank [ . . . ] to another."  USVCP's representative then requested that FDIC get in touch with USVCP's undersigned outside counsel,

Latham & Watkins LLP ("Latham"), to the extent FDIC took a different position.  FDIC did not reply to this email.

67.    On July 17, 2023, USVCP's representative followed up "to again request that [FDIC] get us in contact with your legal team as quickly as possible."  FDIC did not reply to this email either.

68.    In January 2024, USVCP-GP obtained another renewal of the OFAC License.  In connection with the license renewal, USVCP's representative again requested guidance from OFAC concerning whether blocked funds may be transferred to blocked accounts outside of FDIC's Receivership.  In response, Alan Christian, Deputy Assistant Director for Licensing at OFAC, again confirmed that such transfers would be permissible because "OFAC considers [such transfer] as activity ordinarily incident and necessary to the authorizations outlined in Section 1(b) of License No. MUL-2020-36697-8."  OFAC's confirmation that the OFAC License allowed for the transfer of blocked funds from one bank to another was directly in line with its December 30, 2022 email stating the same.

69.    On May 14, 2024, after not hearing from FDIC for nearly a year, a USVCP representative reached out again to FDIC to reopen discussions regarding the transfer of the blocked funds held at FDIC into USVCP's corresponding blocked account, now at Mainstreet Bank.  In his email, the USVCP representative attached the most recent iteration of the OFAC License, Mr. Christian's email confirming the permissibility of transferring blocked funds, and a spreadsheet showing the list of account owners.

70.    On June 5, 2024, USVCP's representative emailed FDIC asking for its progress and noted that he was "quite certain that [USVCP could] assist with this process if you would engage with us.  There is no reason for this to be an adversarial process."  FDIC again did not timely reply to this email.

71.    On June 14, 2024, FDIC asked USVCP's representative to provide a contact at MainStreet Bank, and stated it was ready to take the next steps to initiate the transfer of USVCP's more than $54 million blocked funds at Signature Bank (which had also failed in March 2023).

1    However, FDIC remained unwilling to transfer USVCP's SVB-based Account Funds and provided

2    no guidance on a viable process of transfer.

3              **G.     FDIC Wrongly Denies USVCP's Deposit Claim Form, Forcing Suit**

4              72.    In August 2024, FDIC finally provided USVCP's representatives with deposit

5    claim forms over its blocked funds at Signature Bank.  However, FDIC did not provide the same

6    forms necessary for USVCP to assert its claims over the Account Funds at SVB.  In the cover

7    email, FDIC noted that the records provided by SVB showed Gawker and Immutable as the owners

8    of the Blocked Accounts but did not provide further details.

9              73.    Since USVCP did not consider SVB's account records to be dispositive in light of

10   the other records indisputably showing USVCP to be the true owner of the Blocked Accounts,

11   USVCP used the Signature Bank claim forms to submit claims over the SVB-based Account Funds

12   on August 23, 2024.

13             74.    Over half a year later, on March 5, 2025, FDIC issued a letter denying and

14   disallowing USVCP's claim over the four Blocked Accounts ("Claim Denial Letter") on the

15   ground that "SVB owed no deposit obligation to US VC Partners."

16             75.    In reaching this conclusion, FDIC purported to review "account setup forms for

17   each account that were generated by SVB and maintained in the ordinary course of its business,"

18   which "reflected that the account records was [sic.] held in the name of SVB for one of its clients,

19   Immutable Systems or Gawker."  FDIC also purported to review the fund transmittal instructions,

20   which "consistently reflected SVB's clients as the originators of attempted transfers to US VC

21   Partners that had been blocked before being presented by SVB to US VC Partners' bank."

22             76.    FDIC either ignored or chose not to give weight to any of the additional documents

23   USVCP submitted to FDIC or SVB records and email communications that FDIC could have (and

24   should have) reviewed over the course of two years, including: (1) the fund payment instructions

25   showing USVCP to be the sole payee and beneficiary of the Account Funds; (2) the reports of

26   blocked property that SVB submitted to OFAC; (3) communications between SVB and USVCP's

27   representatives indicating that the Blocked Accounts were set up solely for the benefit of USVCP;

28   (4) the OFAC License, which permitted the USVCP to transfer blocked funds from one bank to

1    another; and (5) the email from OFAC expressly stating USVCP was authorized to transfer

2    blocked funds from one bank to a blocked account in another bank.  These documentations

3    conclusively establish that USVCP was the owner of the Account Funds and that, if not for SVB's

4    delay, these Funds could—would—have been transferred to USVCP's blocked bank account at

5    another bank.

6          77.    FDIC's Claim Denial letter directs USVCP to take steps consistent with 12 U.S.C.

7    §§ 1821(d) and/or (f) if it disagrees with the denial or disallowance of its claim.

8          78.    On April 1, 2025, in an attempt to avoid needless litigation, USVCP contacted

9    FDIC and conveyed its desire to work toward an amicable resolution of its claim via entering into

10   a tolling agreement—one that would preserve USVCP's claims while affording FDIC the

11   opportunity to review the most fulsome set of relevant materials possible.  On April 4, 2025, FDIC

12   declined the tolling agreement request, and stated the 60-day deadline to file suit was jurisdictional

13   and thus firm.

14         79.    Accordingly, Plaintiffs filed this action.

15                            **FIRST CAUSE OF ACTION**

16            **(*DE NOVO* REVIEW OF CLAIM DISALLOWANCE, 12 U.S.C. § 1821(D)(6))**

17         80.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth

18   herein.

19         81.    On August 23, 2024, USVCP, through its representative, timely submitted a deposit

20   claim form.

21         82.    On March 5, 2025, FDIC sent the Claim Denial Letter disallowing USVCP's claim

22   on the basis that "the books and records of SVB reflect no deposit account titled in the name of

23   US VC Partners LP."

24         83.    Under 12 U.S.C. § 1821(d)(6)(A), the Court has *de novo* jurisdiction to determine

25   a plaintiff's claims brought against a failed depository institution for which FDIC is receiver.

26         84.    According to the FDI Regulations outlining the procedures for making

27   insurance/deposit determinations, FDIC generally relies upon a failed depository institution's

28   deposit account records to determine deposit insurance coverage.  C.F.R. § 330.5.  However,

where, as here, "the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned." *Id.*

85.    As set forth herein, in disallowing USVCP's claim, FDIC made the arbitrary determination to consider only the "account setup forms" for each of the Blocked Accounts, as well as the sender information for SVB's OFAC blocking reports.

86.    In doing so, FDIC failed to consider other evidence conclusively showing that the Blocked Accounts were set up specifically for the benefit of USVCP.  Such evidence includes, among other things: (1) communications between USVCP representatives and SVB over the years consistently reflecting the parties' understanding that these accounts belonged to USVCP; (2) wire fund payment instructions listing USVCP as the sole payee and beneficiary of the Account Funds; and (3) SVB's OFAC blocking reports showing the same.

87.    USVCP's ownership over the Blocked Accounts is further confirmed by the fact that SVB provided USVCP representatives with interest income information so that USVCP could pay state and federal income tax on the proceeds of the interests earned on the Account Funds.

88.    The arbitrary nature of FDIC's denial of USVCP's claims is also evinced by the fact that FDIC has granted similar requests to transfer USVCP's blocked funds held at another banking institution—Signature Bank—pursuant to the OFAC License.  Indeed, at the same time that FDIC denied USVCP's claim and transfer of the Account Funds, FDIC permitted the transfer of more than $54 million of USVCP's blocked assets held at Signature Bank pursuant to the OFAC License.  FDIC has no principled basis for treating the Account Funds held by SVB differently.

89.    WHEREFORE, Plaintiffs request, pursuant to 12 U.S.C. § 1821, that this Court hold unlawful and set aside FDIC's disallowance of USVCP's claim over the Account Funds.

## SECOND CAUSE OF ACTION

## (REVIEW OF FINAL AGENCY DECISION, 12 U.S.C. § 1821(F))

90.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

91.     Pursuant to 12 U.S.C. § 1821(f)(4), "[a] final determination by the Corporation regarding any claim for insurance coverage shall be a final agency action reviewable in accordance with" the Administrative Procedure Act, 5 U.S.C. §§ 701-706.    Under the Administrative Procedure Act, the reviewing court must set aside FDIC's determination if it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law as set forth in 5 U.S.C. § 706.

92.     FDIC's denial of Plaintiffs' claims for insurance coverage was arbitrary and capricious, lacked due process and fair notice, and was in contravention to the Treasury Secretary's SRE mandate.

93.     According to the FDI Regulations outlining the procedures for making insurance/deposit determinations, FDIC generally relies upon a failed depository institution's deposit account records to determine deposit insurance coverage.    C.F.R. § 330.5.    However, where, as here, "the deposit account records are ambiguous or unclear on the manner in which the funds are owned, then the FDIC may, in its sole discretion, consider evidence other than the deposit account records of the insured depository institution for the purpose of establishing the manner in which the funds are owned."    *Id.*

94.     As set forth herein, in disallowing USVCP's claim, FDIC made the arbitrary and capricious determination to consider only the "account setup forms" for each of the Blocked Accounts, as well as the sender information for SVB's OFAC blocking reports.

95.     FDIC abused its discretion in failing to consider other evidence provided by USVCP's representatives, which conclusively showed that the Blocked Accounts were set up specifically for the benefit of USVCP.    Such evidence includes, among other things: (1) communications between USVCP's representatives and SVB over the years consistently reflecting the parties' understanding that these accounts belonged to USVCP; (2) fund payment instructions listing USVCP as the sole payee and beneficiary of the Account Funds; and (3) SVB's OFAC blocking reports showing the same.

96.     USVCP's ownership over the Blocked Accounts is further confirmed by the fact that SVB provided USVCP representatives with interest income information so that USVCP could pay state and federal income tax on the proceeds of the interests earned on the Account Funds.

97.     The arbitrary nature of FDIC's denial of USVCP's claims is also evinced by the fact that FDIC has granted similar requests to transfer USVCP's blocked funds held at another banking institution—Signature Bank—pursuant to the OFAC License.  Indeed, at the same time that FDIC denied USVCP's claim and transfer of the Account Funds, FDIC permitted the transfer of more than $54 million of USVCP's blocked assets held at Signature Bank pursuant to the OFAC License.  FDIC has no principled basis for treating the Account Funds held by SVB differently.

98.     FDIC has no valid basis to control, interfere with, or inhibit the payment of the Account Funds that all relevant parties at the time consistently agreed belonged to USVCP.

99.     WHEREFORE, USVCP requests, pursuant to 12 U.S.C. § 1821 and 5 U.S.C. § 706, that this Court hold unlawful and set aside FDIC's denial of USVCP's claim over the Account Funds.

## THIRD CAUSE OF ACTION

### (UNJUST ENRICHMENT)

100.    Plaintiffs repeat and re-allege each of the foregoing paragraphs as if fully set forth herein.

101.    Despite repeated outreach by USVCP representatives since May 2023, FDIC failed to engage with Plaintiffs and their counsel concerning a mutually agreeable resolution to USVCP's claims to the Account Funds.

102.    As set forth herein, shortly after FDIC assumed receivership over SVB, a USVCP representative contacted FDIC on May 16, 2023 to discuss the process of transferring the Account Funds from the Blocked Accounts to a separate USVCP blocked bank account at another banking institution, as SVB had previously agreed.  Plaintiffs explained that the transfer would be made pursuant to the OFAC License that expressly authorized such transfer.

103.    In the nearly two years that followed, Plaintiffs submitted extensive documentation to FDIC and offered to discuss USVCP's ownership structure and the process of transferring the

Account Funds from SVB to another blocked account. Throughout these communications with FDIC, Plaintiffs conveyed that USCVP was open to an amicable resolution and requested FDIC's engagement. FDIC repeatedly delayed in responding and failed to offer paths to resolve or bring clarity to Plaintiffs' rights.

104.    After persistent non-response, FDIC finally provided USVCP's representatives with deposit claim forms, but only over its blocked funds at *Signature Bank*. FDIC did not provide the same forms necessary for USVCP to assert its claims over the Account Funds at SVB.

105.    On August 23, 2024, a USVCP representative used the Signature Bank claim forms to submit claims over the SVB-based Account Funds.

106.    Nearly seven months later—and nearly two years after Plaintiffs' initial outreach—on March 5, 2025, FDIC sent the Claim Denial Letter disallowing and denying USVCP's claim, ignoring the information and evidence provided by Plaintiffs establishing USVCP's rights to the Account Funds.

107.    FDIC made this determination based solely on the consideration of the "account setup forms" for each of the Blocked Accounts, as well as the sender information for SVB's OFAC blocking reports.

108.    FDIC's determination is not only erroneous, but also fundamentally unjust and unconscionable. Before SVB failed in March 2023, SVB had consistently treated the Account Funds as belonging to USVCP. Had it not failed, SVB would have continued to recognize USVCP's ownership over the Account Funds. In fact, one day before its failure, SVB had already agreed to transfer the Account Funds to USVCP's blocked bank account at Signature Bank pursuant to the OFAC License.

109.    FDIC itself has permitted the more than $54 million transfers of USVCP's blocked assets in Signature Bank pursuant to the same OFAC license.

110.    USVCP should not be prejudiced by SVB's delay in transferring the Account Funds pursuant to OFAC License. Nor should USVCP be prejudiced by SVB's ultimate collapse, or any erroneous recordkeeping on which FDIC relies.

111.    There is no genuine dispute as to the intent of Gawker and Immutable to transfer the Account Funds to USVCP.  Immutable and Gawker paid USVCP the Account Funds in satisfaction of duly owed debts.  There is a verifiable paper trail establishing these facts.

112.    There is also no dispute that no other entity has made a competing or conflicting claim on the Account Funds.  Immutable no longer exists to make such a claim on the funds, and Gawker has been restructured and made its payment to USVCP as part of satisfaction of a restructuring plan.  On information and belief, both Immutable and Gawker have closed their SVB accounts.

113.    The practical result of FDIC's determination will be that the Account Funds—which were indisputably paid to and intended for USVCP—will be held in limbo with no legal owner, with FDIC receiving and retaining the full benefit of funds and credits associated with the Account Funds at the expense of USVCP.

114.    Such determination is against equity and good conscience.

115.    WHEREFORE, Plaintiffs seek restitution in the full amount of the Account Funds, plus any and all further amounts to be proven at trial.

## **PRAYER FOR RELIEF**

NOW WHEREFORE, Plaintiffs requests judgment as follows:

    a.  Judgment in USVCP's favor and against FDIC on all causes of action alleged herein;

    b.  An order declaring that USVCP is entitled to possession and insurance coverage of the Blocked Accounts;

    c.  An order directing FDIC to permit Plaintiffs to transfer the full amount of funds associated with the Blocked Accounts to another blocked account at a separate financial institution, pursuant to the OFAC License;

    d.  Compensatory and punitive damages in an amount to be determined, plus pre-judgment and post-judgment interest, fees and costs against;

    e.  An award of Plaintiffs' costs and attorneys' fees as may be permitted by law; and

LATHAM&WATKINS LLP

COMPLAINT
Case No. 5:25-cv-3725

1     f.   Such other and further relief as the Court may deem just and proper.

2                      **DEMAND FOR JURY TRIAL**

3          Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby respectfully

4    demand a jury trial.

5

6    Dated:  April 29, 2025                    LATHAM & WATKINS LLP

7
                                              By */s/ Nicole C. Valco*
8                                                 NICOLE C. VALCO (SBN: 258506)
                                                  *Nicole.Valco@lw.com*
9                                                 505 Montgomery St.
                                                  San Francisco, California 94111-6538
10                                                Telephone: 415-391-0600
                                                  Facsimile: 415-395-8095
11
                                                  MATTHEW S. SALERNO (*pro hac vice*
12                                                pending)
                                                  *Matthew.Salerno@lw.com*
13                                                1271 Avenue of the Americas
                                                  New York, New York 10020-1300
14                                                Telephone: 212-906-1200
                                                  Facsimile: 212-701-9000
15
                                                  Attorneys for Plaintiffs
16                                                US VC Partners LP and US VC Partners
                                                  GP, LLC
17

18

19

20

21

22

23

24

25

26

27

28

LATHAM&WATKINS LLP

COMPLAINT
Case No. 5:25-cv-3725